The next case before us today is United States v. Waldron, 17-4187. Counsel, please make your appearance. Good morning, Your Honors. May it please the Court. Sarah Zalkin. I am appearing on behalf of the appellant, Dijon Waldron. Your Honors, the government argued in closing that the real dispute in this case was dominion and control. There were two sets of keys reportedly found, one on the defendant's person, and the keys on the defendant's person were said to have unlocked an outdoor storage patio that the firearms and other contraband and drug evidence were found. That patio was very important also because the quantity of methamphetamine, when added to the quantity of meth found in the bedroom closet, triggered the statutory mandatory minimum. So at first blush, it might seem, what's the problem? The keys found on the defendant opened the patio storage closet. Well, there were some complicating factors because the government also emphasized that a second set of keys that was said to access that outdoor storage closet were found in a men's jacket in the master bedroom. Mr. Waldron, at the time of his arrest, vociferously denied knowledge that the keys he had clipped to his wallet accessed that patio. This is important because he wasn't the only occupant of that apartment. In fact, he had only resided there for about two months. His girlfriend, who was a co-defendant in this case and who pled guilty before trial, had resided there previously. This is extra important, I argue, because the jury acquitted Mr. Waldron of the possession with intent to distribute heroin. And there had been heroin and methamphetamine found in a pair of women's overalls in the master bedroom closet. So as the government argued in closing, there was a real dispute as to dominion and control. Let me ask you a question about the keys. Was there any evidence at trial that the keys that were found on his person did not open the cabinet in the safe? No. The testimony is that the keys that were clipped to the defendant's wallet chain opened that patio closet. Okay, so whether he denied that he knew that or not, the evidence was that they actually did open the closet in the safe. That's correct. And he repeatedly entreated the officers in his interview, you know, he said the keys that I have go to the front door and to the master bedroom door. Try them. Please try them. One of the grand jurors had asked the Ogden police detective whether anyone had tried to open the front and master bedroom door with the keys found on the defendant's person, and that had not happened. So there was a question, at least going back to the grand jury, there was some puzzlement about the key issue. Now this evidence of him denying that he knew that his key opened the back, the patio door in the safe, did that come in at trial? So that did not come in at trial. It was part of the record, though, down below, because post-verdict pre-sentencing in the motion for reconsideration, the motion for new trial, there were interviews with the defendant, and transcripts of those were attached for the district court's review. Okay, and so is that good enough that it was brought up for the first time on a motion for reconsideration? On the first time, it wasn't. And then we get to the wrinkle of when new counsel came into the case pre-sentencing, new counsel argued that there was ineffective assistance of trial counsel in litigating the motion for new trial because of all of these discrepancies and challenges that could have been brought to the government's evidence at the time of the trial and were not. So, I mean, at trial, your client would have had to be the witness for that, wouldn't he? That could have been brought out through the detectives that interviewed him, I would think, and said, isn't it true that Mr. Waldron stated X, Y, and Z? Okay, so let's just go to the post-trial motions. In your motion for reconsideration, was there an argument there that one of the detectives would have testified to that? Or was it your client propped up that argument? I'm not sure. I believe that that evidence could have been brought out through the detectives who participated in the interviews. No, I understand that, but that's not what the question was. I want to know how it actually was brought up in the post-trial motions. In the post-trial motion, I believe it was brought up that this recorded interview existed and that that could have been brought to the jury's attention and to the trial court's attention. Okay. So then, of course, we have, going back to that recorded interview, something that I found troubling is that the detectives' tape recorder mysteriously malfunctioned when the detectives were interviewing the girlfriend, who was the co-occupant, and the girlfriend had made statements initially saying that everything, all the drugs belonged to her, everything on the premises belonged to her. The inference that can be drawn, at least in defense mind, is that the inconsistent statements the girlfriend made might have given some pause to the detectives who then were intent on finding some evidence that could perhaps more conclusively link Mr. Waldron, who was on parole at the time, who was arguably the subject of the investigation. I mean, she may have said it's mine or whatever, but if he had the key and was an occupant of the same premises, isn't it fair to impute the possession to him as well, even though someone else is arguably trying to take the rap? Well, it might be, but the fact that he did vociferously deny knowledge that he even had access to that patio storage closet and he, I think it's fair, knew that there were a team of law enforcement that were searching the whole apartment. So then when we get to that second set of keys found in the master bedroom closet, that wouldn't have done him much good if he said, no, I didn't know anything, had he actually possessed a second set of keys in his belongings that would have led to the same evidence. I don't know if I've articulated that well. Well, are you saying that the keys that were found in the closet in the coat pocket, nobody tried to unlock anything with them? They just were there? No. It was set at trial. Simply the government's witnesses testified that the keys were similar or were the same or appeared similar, but nobody ever tested that second set of keys on that outdoor patio closet. You are challenging the sufficiency of the evidence as it relates to the conviction, right? I'm challenging the sufficiency of the evidence in terms of dominion and control of Mr. Waldron, specifically to that patio storage closet. I'm looking at the issues that were in your brief. I don't see any issue like that. I mean, the issues, you had a Brady Giglio issue, you had trial instruction issues, you had ineffective assistance of counsel issue, you had ex parte hearing issue. I don't see anything about that. So I think that briefing, I might have gotten caught up in the Brady Giglio issue, which I want to turn to next. Well, that's what it looks, what your issue is, is a Brady Giglio issue. So, I mean, if you're coming here saying that there's some basis for reversing his conviction because the evidence wasn't there, that's not going to cut it with me. I understand, Your Honor. The essence of the Brady Giglio claim is that the officer who reportedly found that second set of keys that was part of the dominion and control to that patio closet had, in fact, minutes before testifying, it came out after a trial, lied to the prosecutors in saying, first he said, I have food poisoning, do I have to come to court and testify? They said, yes, you do. Then he said, oh, by the way, I was placed on leave over the weekend for an unauthorized vehicle pursuit. And the government said, OK. Then went and had that ex parte unreported chambers conference and asked the district court's guidance if they had to disclose the suspension, basically, to defense counsel. And the court said, well, did it involve dishonesty? Was it a suspension at that point or was it an investigation at that point? He had been placed on leave for an investigation into an unauthorized vehicle pursuit. OK. Well, in terms of the Giglio argument, you alluded to the lie to the prosecutor. I don't recall that being part of your brief as it relates to what the universe of misconduct was that would support a Giglio claim. So I recall that in the opening brief, the prosecutors had, after this ex parte conference, had asked the officer. I'm not questioning whether he lied to them. I'm questioning whether you made that part of your argument to support, to indicate that there was a Giglio violation. And I don't want to waste your time. Is it your view that you did that? Because I didn't see it. And if you can't readily find it, that's fine. I don't want to eat up your time looking for it. It is my recollection that I did make that argument, Your Honor. But, all right, beyond that, again, respecting your time beyond that, and I'll look again. Maybe I missed it. But beyond that, would you agree that the only universe of period that we're talking about is what information was known and could have been used at trial? That is correct. And my argument is that had the government conducted their due diligence by not simply taking the sergeant at his word when he said, no, no dishonesty is alleged, it was just this unauthorized vehicle pursuit, that they could have, the government has vast resources. They had an FBI investigator sitting through trial. They could have simply called the Ogden Police Department chief, who the government had sent a Giglio letter to only a few weeks before trial, and said this is an ongoing request through trial. I made the alternative argument that the Ogden Police Department's failure to provide information that the sergeant, who was a witness in this federal trial, had been placed on leave for suspected dishonesty, that that should be imputed to the government under the government's Brady-Giglio duties. Well, was he on leave? Was that the nature of the leave tied to the dishonesty? Yes, he was specifically being investigated for dishonesty, and he had signed a Garrity warning to that effect. All right. Well, the reason I ask that is prior to trial, there was not a consummated report in which these allegations had been sustained. That's correct. Okay. So we had allegations of dishonesty. How would those allegations have been used given 608? Because the sergeant lied to the prosecutors and said he was not. That's assuming that you argued that, right? Yes, assuming that I argued that. So he told the prosecutors that he was not being investigated for dishonesty when, in fact, he had already signed that Garrity acknowledgment to that effect. What about the idea that his testimony wasn't material anyway in light of the other officer's testimony? I mean, he didn't even find the key that worked. Right. He didn't find the key that worked. He said he had food poisoning, but the government still deemed him a necessary witness. No, I understand. I understand they called him and wanted him to testify, but his testimony was cumulative to other witnesses' testimony. Well, that's what the district court determined, but the government emphasized the sergeant's testimony in their closing, and they said that the fact that his closet was so meticulously organized goes to show that the defendant was fully aware of everything that was inside his apartment. Weren't there other people who spoke about the meticulous nature of his closet? Yes, there were other people who spoke of that. There were also, and again this was brought up in the motion for reconsideration of the new trial motion, there were a number of discrepancies among the different officers' testimony about basically who found what where. And in the motion for reconsideration, at best, you get plain error on that, right? Well, my understanding is that counsel had sought an evidentiary hearing in order to develop the record. Well, if you don't make an argument. The point is if the first time an argument surfaces is in a motion for reconsideration, isn't the natural inference at best it's a forfeiture and not a waiver, right? I would concede that point. Okay. Counsel, let me ask. Your fourth issue that you raised is the ineffective assistance of counsel, and normally we say that that's got to be raised under 2255. Do you agree that this record isn't sufficiently developed to determine that? I agree that I do make the argument that there's enough in the face of the government's materials that was presented to the district court, the grand jury testimony, the conflicting reports, that there is enough in the record as it now stands before this court. I understand the precedent about collateral challenges. Are you warning us to take that issue when it might be better developed in a 2255 hearing and he would now have it ruled upon in this case? Is that what you're asking? I would like that, yes. You'd like for us to rule on it? I would. Well, okay. Thank you. Good morning, and may I please the court. Jennifer Williams, Assistant United States Attorney for the District of Utah. Mr. Waldron was convicted by a jury on multiple counts relating to firearm and drug possession. This contraband was discovered by police officers in an outside storage closet and safe therein. The critical evidence linking Mr. Waldron to this contraband was the set of keys to the storage closet and safe that police officers discovered on his person at the time of the search. Sergeant Call, who is the subject of the instant Giglio claim, had nothing to do with the discovery of this set of keys on Mr. Waldron's person directly linking him to the contraband in the closet and safe. Sergeant Call was therefore not a critical government witness, and Mr. Waldron's Giglio claim must fail. Well, what about the fact that the government supposedly emphasized Sergeant Call's role in its closing argument? Did the prosecutor think he was a critical witness? I would disagree with the use of the word emphasize. The prosecution did refer to his testimony, but this court has made it clear that simply, there's the Reese case that we cite in our brief, that simply referring to a witness's testimony does not render that testimony critical or material. What is your take on the question of whether Sergeant Call's lies to the prosecutors are within the scope of the alleged Giglio claim here, the Giglio argument here? Well, I don't believe that that claim was raised by Mr. Waldron. In the statement of facts, it is true that the prosecutors asked him whether the investigation involved lying. He said no. But there was no claim made that that was somehow related to the actual Giglio claim. And I'm not sure how, even if it were, I'm not sure how that would affect the materiality of his testimony at trial, which is the issue that we dispute. For purposes of this appeal, we concede that the impeachment evidence was relevant and that it was suppressed. So the only remaining issue is . . . Well, for analytical clarity, I want to know what's being suppressed, that's all. I mean, what is the universe of stuff that is being suppressed? And that could go towards materiality. It may not, but that's what I'm getting at. Our reading of the opening brief and the motion for a new trial is that the evidence of information being suppressed is the investigation conducted by the Ogden Police Department into this unauthorized pursuit and not what he might or might not have said to the prosecution during trial. What standard of review do we use in assessing the district court's conducting of the ex parte hearing, I mean, in determining whether that was error? I mean, is that an abuse of discretion standard? Is that a de novo standard? What do we use in making that determination? Our position is that because the ex parte conference claim was not made in the motion for a new trial, that it's plain error review. I get that, but one component of plain error is error. Assuming that we were going to reach the first prong of plain error, we have to know what standard to apply, right? Right. I would assume that the district court made no finding on whether it was error, so I would think that the court would . . . The district court never passed on the question of the ex parte communication. What the district court did was conduct an ex parte proceeding, okay? Their argument is that doing that, the act of doing that was error. The question then would be, okay, you say it's plain error. All I'm getting at is if we were to reach prong one, what standard do we use to determine whether that was error or not? I mean, if you don't have an answer immediately available. I'm not certain. I would think that the court would look at the ex parte communication and whether it constituted a constitutional violation de novo. But I can do further research on that and submit a 20HA. I mean, do you agree that in a de novo review that the ex parte proceeding was in and of itself error? No, we wouldn't concede that. I think that the case law is clear that not all ex parte proceedings raise constitutional concerns, and I think it's the nature of the particular ex parte proceeding that the court has to look at. So here there are a number of factors. The fact that the ex parte proceeding, this happened in the middle of a very short trial. The prosecution only became aware that there might even be an issue concerning Sergeant Call once trial had already commenced, and I believe it was during juror selection. They also did not ask the district court for an advisory opinion. All they said was it just came to our attention that he's under investigation. The district court asked whether the allegations involved lying, and the prosecutor said we don't know. We'll go ask. Well, the court offered an advisory opinion, and then so whether it was asked or not really, if I were the defendant, I'd argue that the evil was that the proceeding took place in which a court could have argued, I mean could have offered that opinion. So whether they asked for it or not, it seems to me is not really relevant. Well, I would frame the answer the district court gave a little differently. The district court said if it involves no allegations of lying, then you don't have to disclose it under Giglio. That's not guidance on what to do? In other words, go back, look at it. If it involves lying, you've got to give it over. If it doesn't involve lying, you don't? That's not advice? Well, it differs from the advice that, for example, in the Carroll case where the facts known to the prosecution were more specific. So they actually asked the district court for an opinion. This is what we know, and what do you think we need to do? To hear what the prosecution knew at the time was much more uncertain. If it had turned out that it involved dishonesty and the prosecution then didn't turn it over, do you think the district court would have felt it would have told, given them direction as to what they should do? Well, I wouldn't want to speculate as to that because... If I were the prosecutor, I think I would know what would happen if I didn't do it at that point, which is the district court told me conditionally, if it's this, you do this. Right? Well, even if that's true, that's not the only inquiry into whether an ex parte communication violates due process. That's true. The government does have an interest in protecting the confidentiality of its agents' records, especially in a case like this where they don't know. They've just learned of these allegations. They don't know whether they involve dishonesty. Let me ask you this. Part of this inquiry, at least by the cases I've looked at, does turn on the nature of the proceeding, the ex parte proceeding that took place. Two questions flow from that for me. What is the implication of the fact that this proceeding actually was a Brady-Giglio proceeding in which the government could have made this decision on its own? I mean, in other words, part of the alleged prejudice from an ex parte proceeding is that the defendant doesn't have a right to advocate. The fact of the matter is, at a first instance, the defendant doesn't have a right to advocate on a Brady-Giglio decision, does he? Generally, no. Generally, no. You're sitting in the confines of your office. Do I disclose or do I not? Do you have to get on the phone and call the defendant and ask them what he thinks about it? No. OK. All right. Can I contrast this case with Yan, which is a case that was cited by, if you can, the Third Circuit case? Why? I may be pronouncing it incorrectly. Y-O-H-N. Y-O-H-N. In which? I think the defendant's. No. In which context? The defendant cited it, I believe, in their opening brief, but I'll check. Let's see. Yes. Page 25. And again, I don't want to eat your time if you don't have it readily available. As I've said, it's up to you. Then that's fine. I'm not prepared at this moment to compare this and contrast this case. I want to ask you a question about what we were just talking about. So generally, you don't have a duty to call up the defendant or give the defendant the right to advocate that something should be produced. But did you change that? Or did whoever tried it below change that by going to the district court in the first instance, instead of just using your judgment to make the decision? So where there may not have been a right of the defendant to advocate a position before, did that change once the prosecutor decided to take the issue to the district judge and ask his opinion on the issue? Well, again, I think our answer is that under the circumstances of this case, given the fact that trial had already commenced, that it certainly wasn't plain error to go to the district court and make them aware that there was this potential issue. What does the trial commencing have to do with anything? Brady is a trial right. Brady Giglio is a trial right. The time you use it is in trial. So what does that have to do with anything? Well, in terms of the steps that the prosecution took to bring this to the district court's attention. But I think because one of the things I mean, it's almost a thing. Why did you bring it to his attention at all if it didn't involve dishonesty and it wasn't material? Well, I can't speculate as to why they brought it to the district court's attention. You worked in, obviously, you weren't trial counsel. I wasn't, no. OK. I would like to focus on the prejudice aspect, though. Because I think that even if there was an error, and even if it rises to the level of plain error, the ultimate, the information was eventually disclosed to the defendant. In fact, it formed the basis for their new trial motion. So they became aware of the potential impeachment issue. They have now filed a new trial motion. And so the fundamental question, both with relation to the ex parte communication and with the Giglio claim, is whether he is a critical witness. And so I would argue that because he's not a critical witness for purposes of the Giglio claim, there's also no prejudice, even were this court to conclude that there was error in the ex parte communication. Did their knowledge of this come after trial? Or did they learn of this during trial? The prosecution? No, the defense. No, the defense learned after trial. OK. Shortly after trial. I mean, so there was no, I mean, we're not, I have an argument that they could have somehow gone to the court and said, we want to use this. Because they didn't even learn about it until after the trial was over. No. I think the court can look at, for purposes of the materiality inquiry, what use it would have been to the defendant at trial, given that at that time it was still a pending investigation and no final conclusions had been made. So I think the court can look into that. But no, the defense did not become aware until shortly after trial. And promptly filed a new trial motion, litigating the very issue that was the subject of the ex parte communication. And I just. It was, all right, they didn't find out until after the trial. If I heard you correctly, they weren't prejudiced because it was eventually disclosed. Well, yeah, they were. Why weren't they prejudiced? They couldn't use it in their trial. That's a whole, I mean, there are two layers of prejudice here. One is, I could have advocated for something. I could have advocated for a result. That would be disclosure. When I could use it. Another element of prejudice is, I didn't get to use it. So why isn't it harmful? Who cares that it came out after trial? That creates, that puts them in a procedurally different posture of asking for a new trial when a verdict has been rendered of holding them guilty. So they have been prejudiced, haven't they? Well, but I think for the prejudice inquiry, the court has to look at the effect that they could have made. They could have put the evidence to a trial. And that does dovetail with the argument that, the question whether Sergeant Call, about whom he is the one under investigation, how material was his evidence at trial. OK, well then let me clarify. I thought I heard you say they weren't prejudiced because they eventually got the stuff. No, my answer was they got it and they are now litigating the materiality of his evidence at trial. But the lack of prejudice is going to flow from whether or not it was material. It's not a question that they eventually got the stuff, therefore there is no harm. No, I'm sorry. That wasn't my argument. It was that they eventually got it and they were able to use it to file a new trial motion alleging a Giglio violation. And so the inquiry as to prejudice for the ex parte communication dovetails with the inquiry into whether there was a Giglio violation based on the materiality or not of his testimony. Your time is up. Thank you. Thank you. Did you have cases submitted then? Thank you counsel.